274 So.2d 615

**UNITED STATES FIDELITY & GUARANTY CO., a corp.**

v.

**BIRMINGHAM OXYGEN SERVICE, INC., a corp.**

**SC 131.**

Supreme Court of Alabama.

March 15, 1973.

James M. Fullan, Jr., Birmingham, for appellee.

Spain, Gillon, Riley, Tate & Ansley, and Ollie L. Blan, Jr., Birmingham, for appellant.

HARWOOD, Justice.

Birmingham Oxygen Service, Inc., brought a declaratory action in the Circuit Court of Jefferson County, Alabama, in Equity, against the United States Fidelity & Guaranty Company, a Corporation, hereinafter referred to as U. S. F. and G. and Cynthia J. Aldridge, as Administratrix of the estate of Clarence Aldridge, deceased. The purpose of the proceedings was to have a declaration that U. S. F. and G. was obligated to defend a suit brought by Cynthia J. Aldridge, as Administratrix, etc., against the Oxygen Service and to pay any damages that might be awarded in the Aldridge suit.

After a hearing, the Chancellor entered a decree that U. S. F. and G. was bound and obligated under the terms of its policy to defend the suit at law brought by Cynthia Aldridge as Administratrix, etc., against Birmingham Oxygen Service, and to pay within the limits of the policy any judgment rendered in said suit at law. From this decree, U. S. F. and G. has perfected this appeal.

Clarence Aldridge, beset with emphysema, began utilizing the services of Birmingham Oxygen on 27 March 1967, when he rented from said Service an intermittent positive pressure breathing device or machine and purchased from the Service a supply of oxygen. The oxygen was contained in cylinders to be attached to the breathing device.

No written contract was ever made between the parties.

Deliveries of oxygen were first made on a regular schedule, but later the deliveries were made on the basis of a telephone call from a member of the Aldridge family.

The Aldridges and the Oxygen Service arranged that the oxygen cylinders upon delivery would be placed on a breezeway at the rear of the Aldridge home where the empty cylinders would also be placed, the empties being picked up at the time of the delivery of the filled cylinders.

The oxygen deliveryman would not knock or make his presence known, though if a member of the Aldridge family was seen, a receipt for the newly delivered cylinders would be procured. The Aldridges were able to attach the cylinders to the breathing machine and this chore was never performed by the deliveryman.

At first, Mr. Aldridge required only one cylinder of oxygen per delivery. As his need for oxygen increased beginning in December 1967, two cylinders would be delivered upon order, a renewal order being phoned in when one cylinder became empty. Mr. Aldridge's oxygen requirements ranged between four and twelve cylinders per month.

The cylinders containing the oxygen were green in color, and the Aldridges were cognizant of this fact.

While the regular hours of business of the Oxygen Service are from 8:30 A.M. to around 5:00 P.M., it maintained an answering service which notified whichever employee of the Service was on call "for

the purpose of making oxygen deliveries during all non-businesss hours."

At 8:00 A.M., on 30 September 1968, Mrs. Aldridge telephoned the Service and placed an order for oxygen. Of the two previously delivered cylinders, one was empty, and the other one, which was attached to the breathing device, contained an unknown quantity of oxygen.

Mrs. Aldridge left for work at 8:15 A. M. Upon her return from work at 5:45 P.M., she observed two cylinders on the breezeway which she thought to be oxygen. These two cylinders were blue in color, rather than green.

Unknown to the Aldridges, these two blue cylinders contained nitrous oxide, an anesthetic, which is never delivered to private homes but only to dentists, doctors, or hospitals.

At 4:30 A.M., the following morning (1 October 1968), the oxygen cylinder attached to the breathing machine having become empty, Mrs. Aldridge procured one of the blue cylinders and attempted to attach it to the breathing machine. She could not make the attachment, nor could she attach the second blue cylinder. In fact, the blue tanks are so designed that they cannot be attached to the type of breathing machine used by Mr. Aldridge.

Mr. Aldridge then began using a portable oxygen breathing machine. After an hour or so this oxygen supply was exhausted. When it became apparent that this oxygen supply was depleted, Mrs. Aldridge placed a call to complainant's telephone number and stated that oxygen was needed, and that wrong cylinders had been delivered the previous day. She was informed by the person answering her call that oxygen would be delivered as soon as someone came in. Three more calls were made by Mrs. Aldridge, at 7:00 A.M., 8:00 A.M., and shortly after 8:00 A.M., repeating the order and explaining the desperate need for oxygen. Again promises were made to deliver oxygen.

Shortly after the last call, since no oxygen had been delivered, Mrs. Aldridge telephoned for an ambulance, requesting that oxygen be brought with the ambulance.

The oxygen company's truck arrived at about the same time as the ambulance. Whether it arrived before or after the ambulance, is in dispute under the evidence.

Mr. Aldridge was taken in the ambulance to a hospital where he died the next day.

The blue cylinders had been erroneously delivered to the Aldridge home by an inexperienced deliveryman on his first day of employment. He had not been instructed as to the difference between the blue cylinders and the green ones. The error was discovered by Dan Moseley, an experienced deliveryman of the company, around 5:00 P.M., on 30 September.

Moseley testified that upon discovering the error in the delivery of the cylinders, he delivered a full cylinder of oxygen to the Aldridge home between 6:00 and 7:00 P.M., on 30 September 1968, leaving it on the breezeway with the blue cylinders. He did not notify the Aldridges of this delivery, nor tell them of the erroneous delivery of the nitrous oxide cylinders.

In this connection, Mrs. Aldridge testified that when she went to the breezeway at 4:40 A.M., on 1 October 1968, she did not notice any cylinders there other than the two blue ones.

Moseley further testified that when he delivered the cylinder of oxygen on 30 September, he noticed the two blue cylinders in the breezeway. He did not retrieve them since a delivery was scheduled for the next morning and he knew they could not be attached to the breathing device. Upon arriving at work on the morning of 1 October, he learned of the Aldridge's call for oxygen and left with two cylinders of oxygen within 15 minutes. He testified he arrived about five minutes before the ambulance and proceeded to administer to Mr.

Aldridge with the green cylinder he had left in the breezeway the day before.

There was evidence to the effect that the green and blue cylinders are indistinguishable to the untrained eye except for their colors. The Aldridges had never been told of the differences in the contents of the two cylinders.

On 19 December 1968, Mrs. Clarence Aldridge, as administratrix of the estate of Clarence Aldridge, deceased, filed a five count complaint against Birmingham Oxygen Service for the wrongful death of her husband.

Birmingham Oxygen referred the complaint to United States Fidelity and Guaranty Company which notified them that the claim was not within the coverage of a policy issued by U. S. F. and G. to the Oxygen Service. This declaratory action followed which resulted in a decree in favor of the Birmingham Oxygen Service as above mentioned.

The policy herein involved is termed a Special Multiperil Policy. The policy contains a schedule of several different types of coverage available under the liability section of the policy. This schedule shows that Birmingham Oxygen purchased two of these types of coverage: "Premises-Operations Hazard," and "Products-Completed Operations Hazard."

The "Premises-Operations Hazard" furnishes the basic liability coverage, and in Section II C, said coverage is set forth as follows:

"This Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this Section applies, caused by an occurrence and arising out of the ownership, maintenance or use of the premises, and all *operations* necessary or incidental thereto * * *" (Emphasis ours.)

We note here that under the "Definitions" provision of the policy the term "operations" is not defined. However, in paragraph (II—Definitions, i, 2, a) *pertaining solely* to "Products-Completed Operations Hazard," it is set forth that "the following shall not be deemed to be 'operations' within the meaning of *this paragraph*:

a. —pick up or delivery, except from or onto a railroad car." (Emphasis ours.)

Appellant's assignment of error No. 1 reads:

"The trial court erred in rendering judgment for complainant (appellee) and against this respondent (appellant)"

Under this assignment, counsel for appellant argues several reasons as supportive of his assertion of error. We find no merit in any of the reasons advanced.

First, if we interpret counsel's argument correctly, it is asserted that there was no "occurrence" causing injury to Clarence Aldridge arising out of the operations of the Birmingham Oxygen's business.

It would seem that the terms of the policy itself furnishes an answer to this question. In paragraph g of the "Definitions" section of the policy "Occurrence" is defined as follows:

" 'Occurrence' means an event, or a continuous or repeated exposure to conditions, which causes bodily injury or property damage during the policy period that is neither expected nor intended by the insured."

In brief, however, counsel writes:

"In the case at bar the *occurrence*— the event—which allegedly caused bodily injuries to Clarence Aldridge was the deprivation of oxygen on October 1. The reason for this is the failure of the two tanks to supply oxygen * * * Nothing affirmative occurred. The tanks were absolutely passive."

A complete answer to the above contention is that the activity or passivity of the cylinders of oxygen is not the basis of the administratrix's claim for damages, but rather the alleged negligence of Birmingham Oxygen in supplying the cylinders of oxygen under the circumstances averred in the suit for damages.

"Occurrence" has been defined as "that which occurs, an event, incident or happening," (Jones v. Kansas City (Mo.), 243 S. W.2d 318); or as "* * * synonymous with event and applies literally to anything that happens or occurs" Portaro v. American Guarantee and Liability Ins. Co., D.C., 210 F.Supp. 411.

█ We hold that there was an "occurrence" within the terms of the coverage provisions of the policy set out above.

██ Counsel for appellant next argues that the act complained of in the complaint filed in the damage suit arose out of the delivery of oxygen cylinders, and therefore should not be considered an "operation" under the terms of the policy. To sustain this argument, counsel attempts to invoke a provision of paragraph II—i, 2, a, which by its terms is limited to the Products-Completed Operation Hazard insurance. These provisions have been set out above. While the term "operations" does appear in the two categories of coverage for which premiums were paid, we see no basis for holding that the definition of "operations" pertaining to the Products-Completed Operation Hazard coverage should be applied so as to limit the general and undefined term "Operations" appearing in the general coverage provisions. Clearly, under the evidence the sale and delivery of oxygen and allied gases was the principal business of Birmingham Oxygen Service, and without question was necessary and incidental to the operation of the business.

Counsel next contends that Mrs. Aldridge's cause of action is grounded in contract and not in tort, and was therefore within the exclusion of the contract provided in Section III B, Subsections. This allegedly applicable exclusionary provision reads:

"III—Exclusions

"This policy does not apply:

\* \* \* \* \* \*

"B. Under Coverage C of Section II

\* \* \* \* \* \*

"2. To any obligation for which the insured may be held liable in an action on contract *or an agreement by a person not a party thereto."* (Emphasis ours.)

Counts 1, 2, and 3, of the complaint filed in the damage suit set forth in the forepart of each count, the need of Clarence Aldridge for oxygen, the rental of the breathing machine from Birmingham Oxygen Service, the ordering of oxygen cylinders on 30 September 1968, and the delivery of unusable cylinders by Birmingham Oxygen.

Count 1 then charges that Birmingham Oxygen negligently delivered cylinders with attachments that would not connect or attach to the breathing machine, and as a proximate result of such negligence Clarence Aldridge died.

Count 2 is substantially the same as Count 1 except that the negligence averred was the delivery of cylinders which did not contain oxygen, but contained an anesthetic gas.

Count 3 is the same as Counts 1 and 2 in the preliminary averments, but charges negligence on the part of Birmingham Oxygen in failing or refusing to deliver the oxygen cylinders upon the urgent request of the Aldridges.

Counts 4 and 5 were based on breach of warranty.

The allegations as to the agreement set out in Counts 1, 2, and 3, were mere matters of inducement to show the relation between the parties, and to show there was a breach of duty owed by the Birmingham

Oxygen Service to Clarence Aldridge, arising from the contractual relations of the parties. Carpenter v. Walker, 170 Ala. 659, 54 So. 60; Western Union Telegraph Co. v. Hill, 163 Ala. 18, 50 So. 248.

■ If a cause of action declared in pleading arises from a breach of a promise, the action is ex contractu, whereas if it arises out of a breach of a duty growing out of the relationship of the parties because of the contract, the action is in form ex delicto. White v. Levy, 91 Ala. 175, 8 So. 563; Chambers v. Birmingham Trust & Savings Co., 232 Ala. 609, 168 So. 893; Wesson Oil & Snowdrift Co., Inc. v. Orr, 274 Ala. 463, 149 So.2d 462; Paul v. Escambia County Hospital Board, 283 Ala. 488, 218 So.2d 817; C and C Products, Inc. v. Premier Industrial Corp., 290 Ala. 179, 275 So.2d 124.

■ We hold that as to Counts 1, 2, and 3, Mrs. Aldridge's action as administratrix was in tort, and therefore the exclusion which U. S. F. and G. seeks to invoke is not applicable to these counts.

In brief counsel for U. S. F. and G. contends that:

"Counts 4 and 5 are clearly contract actions for breach of warranty. Mrs. Aldridge was not a party to the contract, yet she is bringing this action. We submit that Exclusion B 2 removes her lawsuit from any coverage otherwise available."

Counsel does not further elaborate. Apparently it is counsel's view that the agreement was between Birmingham Oxygen Service and Mr. Aldridge, and Mrs. Aldridge not being a party thereto cannot bring any action, even as administratrix, because of the provisions of the exclusionary clause B 2.

Under Section 123, Title 7, Code of Alabama 1940, a personal representative may maintain an action and recover damages for the wrongful act, omission, or negligence of any person whereby the death of his testate or intestate was caused, if the testator or intestate could have maintained an action for such wrongful act, omission, or negligence, if it had not caused death.

■ In such action, a personal representative acts as agent of legislative appointment, and upon a recovery, he acts as a quasi trustee for those who are entitled thereto under the statute of distribution. Such damages are not subject to administration and do not become a part of the deceased's estate. Shirley v. Shirley, 261 Ala. 100, 73 So.2d 77; Holt v. Stollenwerck, 174 Ala. 213, 56 So. 912; Breed v. Atlanta, V. & C. R. Co., 241 Ala. 640, 4 So.2d 315; Bell v. Riley Bus Lines, 257 Ala. 120, 57 So.2d 612.

Further, the decree rendered by the Chancellor is general in nature, and is referable to any of the counts in the complaint filed by the administratrix that would sustain it, just as a general verdict is referable to any good count in a complaint.

Counts 1, 2, and 3, would therefore furnish a sufficient basis to sustain the decree rendered by the Chancellor.

We would be indulging in speculation to assume that the complaint filed by the administratrix might not be amended even to the extent of striking some of the counts, adding other counts, etc., prior to submitting the issues to the jury. In the posture of the case as now presented to us in this declaratory action, any conclusion other than the one we have reached would be premature and unwarranted.

Counsel has made several additional assignments of error. What we have written above is applicable to these additional assignments, and is dispositive of them.

Affirmed.

HEFLIN, C. J., and MERRILL, MADDOX and FAULKNER, JJ., concur.