CAMP DRESSER & MCKEE, INC. *vs.* THE HOME INSURANCE
COMPANY; IMPERIAL CASUALTY AND INDEMNITY COMPANY,
intervener.

No. 89-P-111.

Suffolk. January 9, 1990. - March 26, 1991.

Present: BROWN, SMITH, & JACOBS, JJ.

*Insurance*, General liability insurance, Coverage, Insurer's obligation to
defend, Disclaimer of liability, Professional services exclusion, Con-
struction of policy. *Negligence*, Duty to warn. *Contract*, Insurance.

An insurer whose policyholder under a comprehensive general liability pol-
icy was named as a defendant in an action encompassing a claim of
ordinary negligence arising from the policyholder's management or con-
trol of a certain wastewater treatment plant failed to establish, in a
declaratory proceeding, that the professional liability exclusion to the
policy exempted it from its duty to defend the policyholder in the un-
derlying action, where the policy did not expressly exclude from cover-
age claims of ordinary negligence or negligent management or control,
and where the policy's use of the word "supervisory" in the clause ex-
cluding from coverage "supervisory, inspection or engineering services"
was reasonably susceptible of ambiguous interpretation [320-325];
moreover, in unjustifiably disclaiming its duty to defend, the insurer
was liable for the reasonable costs of both defense and settlement [325-
326].

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 3, 1985.

The case was heard by *Paul K. Connolly*, J.

*Allen N. David* (*Kevin J. O'Connor* with him) for The
Home Insurance Company.

*Francis H. Fox* (*Joanne D'Alcomo* with him) for Camp,
Dresser & McKee, Inc., & another.

JACOBS, J. The defendant, The Home Insurance Company
(Home), appeals from a judgment which, in effect, declared
it in breach of its duty to defend the plaintiff, Camp Dresser
& McKee, Inc. (CDM), and ordered it to pay certain settle-

ment and defense costs incurred by or in behalf of CDM.[1] We affirm.

We summarize the facts as found by a Superior Court judge after a trial without jury. CDM is an international consulting engineering firm. At the time in issue, CDM was under contract with the city of Detroit to provide extensive services in connection with Detroit's water pollution control system and its wastewater treatment plant (plant). In 1981, Joseph Brown, an employee of the city of Detroit, suffered severe injuries when his left hand and arm were drawn into a conveyor machine (conveyor A) at the plant. Employees at the plant commonly engaged in the dangerous practice of throwing ash onto wet conveyor belts in order to create friction and reduce slippage. Brown was injured when he got too close to conveyor A while attempting to throw ash onto the head pulley, which turned and pulled the conveyor belt. At the time, a guard was missing from the head pulley, thereby exposing that portion of the conveyor in which Brown's hand and arm became entangled. CDM had not issued any warnings concerning the missing guard or the practice of throwing ash.

In 1982, Brown (and members of his family exercising derivative rights) sued CDM in a Michigan State court alleging injuries due to negligence. Imperial Casualty and Indemnity Company (Imperial), CDM's professional liability insurer under a policy with a $150,000 deductible, assumed defense of the case. Thereafter, CDM notified Home that it claimed coverage under the comprehensive general liability policy which Home had issued it and which had no deductible. Home initially disclaimed coverage on the basis of the allegations in the Brown complaint and the language of the professional liability exclusion in its general liability policy. After investigation, Home again disclaimed coverage. CDM then filed this action seeking a judgment declaring Home's

---

[1]Judgment was in the amount of $306,023.44, together with postjudgment interest from October 31, 1988, and court costs. Home does not challenge the computations on which the judgment is based, nor does it dispute the reasonableness or apportionment of the settlement and defense costs.

obligations under its general liability policy. Imperial later intervened as a plaintiff in this suit. During the pendency of this action, $265,000 was contributed by and in behalf of CDM to a settlement of the Brown litigation. Imperial paid defense expenses and so much of the settlement contribution as exceeded the $150,000 deductible.

The relevant broad coverage provision of Home's liability policy stated:

"[Home] will pay on behalf of [CDM] all sums which [CDM] shall become legally obligated to pay as damages because of bodily injury . . . due to an occurrence,[2] and [Home] shall have the . . . duty to defend any suit against [CDM] seeking damages on account of such bodily injury . . . even if any of the allegations of the suit are groundless, false or fraudulent. . . ." An endorsement to Home's policy contained the following standard "Engineers, Architects or Surveyors Professional Liability" exclusion:[3] "It is agreed that the insurance does not apply to bodily injury or property damage arising out of the rendering of or failure to render any professional services by or for [CDM], including (1) the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications and (2) supervisory, inspection or engineering services."

The issue presented is whether the professional liability exclusion exempted Home from all duty to defend CDM against the Brown suit. The Brown complaint alleged that CDM was responsible for the operation of the plant and its equipment and that Joseph Brown's injuries were due to CDM's "negligence and wrongdoing" which consisted, "inter alia," of its failure to advise and warn of the limitations on the use of conveyor A and its failure properly and adequately to (1) exercise control over the operations of the plant, including conveyor A; (2) make recommendations concerning

---

[2]The policy defines "occurrence" as "exposure of persons . . . to conditions which results in bodily injury. . . . "

[3]The "exclusions" section of the Home policy also contained a professional liability exclusion. Home apparently chose to waive application of that exclusion for purposes of this suit and elected to rely solely on the professional liability exclusion in the separate endorsement.

the safe operation of conveyor A "so as to protect against foreseeable hazards"; (3) "advise and warn of the dangers and hazards attendant upon the use of "[conveyor A]"; and (4) "instruct on the operation, repair and maintenance of" conveyor A and its parts.

The judge found that, at the time of Brown's injury, CDM's relationship to the plant was based upon four contracts which it had with the city of Detroit. He found that the "lead consultant contract . . . was a long term contract in which CDM's main function was project management to coordinate the projects of all consultants at the plant." The other contracts required CDM: (1) to prepare operation and maintenance manuals for the plant and to develop and implement a training program; (2) to develop an energy efficient design for various disposal facilities; and (3) to evaluate the plant in terms of efficiency and capacity.

While no reported appellate decision in Massachusetts has addressed or defined the scope of an engineer's professional liability exclusion to general liability insurance coverage, the decisions dealing with insurance policies provide considerable guidance. As a general rule, the policyholder bears the initial burden of proving coverage within the policy description of covered risks. *Markline Co.* v. *Travelers Ins. Co.*, 384 Mass. 139, 140 (1981). Once basic risk coverage is established, the burden shifts to the insurer to prove the applicability of any exclusion to coverage set forth outside of the insuring clause. See *Murray* v. *Continental Ins. Co.*, 313 Mass. 557, 563 (1943); *Ratner* v. *Canadian Universal Ins. Co.*, 359 Mass. 375, 381 (1971). The fact that CDM sought declaratory relief does not alter the defendant's burden of proof. *Stop & Shop, Inc.* v. *Ganem*, 347 Mass. 697, 703 (1964). *Ranger Ins. Co.* v. *Air-Speed, Inc.*, 9 Mass. App. Ct. 403, 406 n.9 (1980).

"It is settled in this jurisdiction, and generally elsewhere, that the question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions. . . ." *Sterilite Corp.* v. *Continental Cas. Co.*, 17

Mass. App. Ct. 316, 318 (1983). If the allegations of that complaint can be reasonably read to "state or adumbrate a claim covered by the policy terms," the insurer is obligated to defend. *Ibid.* See *Continental Cas. Co. v. Gilbane Bldg. Co.*, 391 Mass. 143, 146-147 (1984); *Terrio v. McDonough*, 16 Mass. App. Ct. 163, 166 (1983). In order to give rise to the duty to defend, the underlying complaint need show only a possibility of coverage. *Sterilite Corp. v. Continental Cas. Co.*, *supra* at 319.

There being no dispute that the complaint in the underlying action alleged bodily injury due to an "occurrence," we look to whether Home has established that the professional liability exclusion exempted it from all duty to defend CDM in the underlying action. "[T]he obligation of the insurer to defend is based not only on the facts alleged in the complaint[ ] but also on the facts that are known or readily knowable by the insurer." *Desrosiers v. Royal Ins. Co.*, 393 Mass. 37, 40 (1984). *Terrio v. McDonough, supra* at 167. The judge, in effect, found that Home, prior to its second disclaimer of coverage, knew or should have known that the underlying case involved a claim of negligence based on CDM's failure properly to warn of the hazards of throwing ash onto the conveyor at a point near an unguarded pulley. As that finding has support in the record, it is not clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974).

Michigan tort law generally encourages the implementation of reasonable safeguards against risks of injury and imposes on parties exercising control of work sites a duty to take appropriate precautions. *Funk v. General Motors Corp.*, 392 Mich. 91 (1974). *Smith v. Allendale Mut. Ins. Co.*, 410 Mich. 685, 739 (1981). That duty may include the obligation to warn another's on-site employees of serious and known risks. See *Clark v. Dalman*, 379 Mich. 251, 262 (1967), and *id.* at 265 (Black, J., concurring). Failure to comply with that duty by a party rendering contractual services at the work site may constitute ordinary negligence as well as a breach of contract. "[T]he contract merely creates the state

of things which furnishes the occasion of the tort." *Id.* at 261.

The general allegations of the underlying complaint charging inadequate control and failure to warn, coupled with information, chargeable to CDM, of the specific nature of the risk, were sufficient to alert Home that the underlying action encompassed a claim of ordinary negligence arising from CDM's management or control of the plant. That CDM's contractual responsibilities may not have encompassed general management or control of the plant is of no significance since Home had an obligation to defend against even groundless claims within the coverage of the general liability policy. Also, it is irrelevant that many of the complaint allegations fell within the exclusion or within Imperial's professional liability coverage.[4] We return, therefore, to the exclusion to determine whether it excuses Home from defending against a claim of ordinary negligence arising from CDM's management or control of the plant.

In determining whether an omission or activity falls within the scope of a professional services exclusion, courts generally look to the nature of the conduct under scrutiny rather than to the title or the position of those involved. See *Marx v. Hartford Acc. & Indem. Co.*, 183 Neb. 12, 14 (1968); *Duke Univ. v. St. Paul Fire & Marine Ins. Co.*, 96 N.C. App. 635, 639 (1990). Accordingly, the fact that CDM's contracts with the city of Detroit may have been performed by engineers or other professionals does not compel the conclusion that the contracts, in all respects, called for professional services. Such an interpretation would have the exclusion swallow the policy.

Interpretation of the language of the exclusion presents a question of law. *Save-Mor Supermarkets, Inc. v. Skelly Detective Serv., Inc.*, 359 Mass. 221, 226 (1971). In this interpretation, we are guided by three fundamental principles:

---

[4]Home could have undertaken the defense of the underlying action with a reservation of rights with respect to the excludable claims. It also could have resolved respective defense responsibilities by agreement with Imperial.

(1) an insurance contract, like other contracts, is to be construed according to the fair and reasonable meaning of its words, *Cody* v. *Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146 (1982); (2) exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured, *Vappi & Co.* v. *Aetna Cas. & Sur. Co.*, 348 Mass. 427, 431-432 (1965); *Bates* v. *John Hancock Mut. Life Ins. Co.*, 6 Mass. App. Ct. 823 (1978); *Sterilite Corp.* v. *Continental Cas. Co.*, 17 Mass. App. Ct. at 321 n.10; and (3) doubts created by any ambiguous words or provisions are to be resolved against the insurer, *Cody* v. *Connecticut Gen. Life Ins. Co.*, *supra* at 146; *Bates* v. *John Hancock Mut. Life Ins. Co.*, *supra.*

Neither resort to standard definitions nor parsing of the language of the exclusion is helpful in determining whether the terms "professional services" or "engineering services" include management tasks. The general focus of definitions of "professional services" is on whether an occupation requires specialized knowledge and calls for mental rather than physical skills. 7A Appleman, Insurance Law and Practice § 4504.01 (rev. ed. 1979 & Supp. 1990). Black's Law Dictionary 1089 (5th ed. 1979). "Engineering" is commonly construed as the "art and science by which the mechanical properties of matter [or energy] are made useful to man in structures and machines." *Employers' Liab. Assur. Corp.* v. *Accident & Cas. Ins. Co.*, 134 F.2d 566, 569 (6th Cir. 1943). See Webster's Third New Intl. Dictionary 752 (1971). How other jurisdictions have interpreted the same or similar exclusions is also of little assistance since the analysis of the exclusionary language is dependent upon the nature and context of the claims in the underlying actions.[5]

---

[5]Noteworthy, however, among the decisions involving the same or similar exclusionary clauses are two decisions of the Court of Appeal of Louisiana, *CBM Engrs., Inc.* v. *Transcontinental Ins. Co.*, 460 So. 2d 745, 747 (La. Ct. App. 1984), and *Gregoire* v. *AFB Constr., Inc.*, 478 So. 2d 538, 541 (La. Ct. App. 1985), which held that an engineering firm's breach of its duty to warn of unsafe conditions could be found to be outside of the "professional" or "supervisory" services it contracted to provide.

Two aspects of Home's exclusionary language are determinative: (1) claims of ordinary negligence or negligent management or control are not expressly precluded; and (2) the word "supervisory" in the clause excluding from coverage "supervisory, inspection or engineering services" is reasonably susceptible of ambiguous interpretation. It can be construed narrowly as describing supervision of purely professional activities or broadly as describing management or control of aspects of a project involving both professional and nonprofessional activities. The underlying claims of negligent management or control in this case properly can be treated as falling outside the former construction and within the latter. The burden of the failure clearly to exclude all of the claims in the underlying action must fall on the insurer. *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. 393, 414 (1990). *Terrio* v. *McDonough*, 16 Mass. App. Ct. at 168. Also, the ambiguous language redounds to the benefit of CDM. "If an insurer chooses to use language in a policy which permits two rational interpretations, we choose the one more favorable to the insured." *MacArthur* v. *Massachusetts Hosp. Serv., Inc.*, 343 Mass. 670, 672 (1962). *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc., supra* at 414.

Home concedes that, if it was bound to defend CDM in the underlying action, it is liable for incurred defense costs. It argues, however, that, whatever its duty to defend may have been, it should not, in this action, be held liable for settlement costs. It is settled that "the obligation to indemnify does not ineluctably follow from the duty to defend." *Newell-Blais Post #443, Veterans of Foreign Wars of the U.S., Inc.* v. *Shelby Mut. Ins. Co.*, 396 Mass. 633, 638 (1986). Home points out that, had the Brown claims gone to judgment, it would be accorded an opportunity, in a subsequent suit for indemnification, to litigate any issue of policy coverage not resolved in the underlying litigation. See *Miller* v. *United States Fid. & Guar. Co.*, 291 Mass. 445, 448-449 (1935); *Sweeney* v. *Frew*, 318 Mass. 595, 597 (1945); *Saragan* v. *Bousquet*, 322 Mass. 14, 20 (1947); *Lodge* v. *Bern*, 328 Mass. 42, 45 (1951). It argues, therefore, that to require in-

demnification of the settlement amount without a specific judicial finding placing Brown's claim outside the terms of the exclusion would improperly "enlarge the bargained-for coverage as a penalty for breach of the duty to defend." *Servidone Constr. Corp.* v. *Security Ins. Co.*, 64 N.Y.2d 419, 424 (1985). While that analysis has support in some quarters,[6] it is not the law in Massachusetts. Our cases generally have recognized the peril implicit in unjustified disclaimer decisions, *Terrio* v. *McDonough*, 16 Mass. App. Ct. at 169; *Shapiro* v. *Public Serv. Mut. Ins. Co.*, 19 Mass. App. Ct. 648, 655 (1985), and held an insurer making such a decision liable for the reasonable costs of both defense and settlement. *Berke Moore Co.* v. *Lumbermens Mut. Cas. Co.*, 345 Mass. 66, 70-71 (1962).[7] See *Trustees of the N.Y., N.H. & H.R.R.* v. *Tileston & Hollingsworth Co.*, 345 Mass. 727, 731-732 (1963); *Mission Ins. Co.* v. *United States Fire Ins. Co.*, 401 Mass. 492, 501 n.6 (1988); *Deerfield Plastics Co.* v. *Hartford Ins. Co.*, 404 Mass. 484, 485-486 (1989). Given the current litigation environment, we believe this approach, which encourages reasonable settlements, continues to be valid.

*Judgment affirmed.*

[6]See *Afcan* v. *Mutual Fire, Marine & Inland Ins. Co.*, 595 P.2d 638, 647 (Alaska 1979); *Sunseri* v. *Camperos Del Valle Stables, Inc.*, 185 Cal. App. 3d 559, 561-562 (1986); *Keller Indus.* v. *Employers Mut. Liab. Ins. Co.*, 429 So. 2d 779, 780 (Fla. Dist Ct. App. 1983); *Hirst* v. *St. Paul Fire & Marine Ins. Co.*, 106 Idaho 792, 799 (Ct. App. 1984); 7C Appleman, Insurance Law and Practice § 4690, at 235 (rev. ed. 1979 & Supp. 1990).

[7]In accord with our rule see *Missionaries of the Co. of Mary, Inc.* v. *Aetna Cas. & Sur. Co.*, 155 Conn. 104, 114 (1967); *Casualty Ins. Co.* v. *Northbrook Prop. & Cas. Ins. Co.*, 150 Ill. App. 3d 472, 478 (1986); *Thomas W. Hooley & Sons* v. *Zurich Gen. Acc. & Liab. Ins. Co.*, 235 La. 289, 299 (1958); *Ames* v. *Continental Cas. Co.*, 79 N.C. Ct. App. 530, 538 (1986). See also Keeton & Widiss, Insurance Law § 9.5(b)(1) (1988).