608 A.2d 822

**CHESAPEAKE PHYSICIANS PROFESSIONAL ASSOCIATION, et al.**

v.

**The HOME INSURANCE COMPANY.**

**No. 1190 Sept. Term, 1991.**

Court of Special Appeals of Maryland.

July 2, 1992.

Thomas V. Monahan, Jr. and Linda S. Woolf (Goodell, DeVries, Leech & Gray, on the brief), Baltimore, for appellants.

Mary S. Akerley (Phillip R. Zuber and Sasscer, Clagett & Bucher, on the brief), Upper Marlboro, for appellee.

Argued before BLOOM, ROSALYN B. BELL and FISCHER, JJ.

ROSALYN B. BELL, Judge.

Chesapeake Physicians Professional Association (CPPA), Medical Enterprise Development Company, Inc. (MEDCO), and Chesapeake Health Plan, Inc. (CHP) (collectively, the Chesapeake companies), appellants in this case, filed a declaratory judgment action in the Circuit Court for Baltimore City against The Home Insurance Company (Home). The Chesapeake companies sought a judgment declaring that

Home had a duty to defend and indemnify the Chesapeake companies against claims stated in a lawsuit against them (the *Wilson* litigation). The trial judge entered a judgment declaring, as a matter of law, that Home had no duty either to indemnify or defend under its policies with the Chesapeake companies, and the Chesapeake companies have appealed. They contend that the trial judge erred:

—in ruling that Home's unilateral liability limitation endorsement to the insurance policies effectively converted the policies from comprehensive general liability (CGL) coverage to premises liability only;

—in further ruling, under his interpretation of the policies, that the allegations of the *Wilson* complaint did not come within the insurance policies; and

—in ruling that Home did not breach its duty to defend and/or indemnify the Chesapeake companies under the insurance policies.

We will affirm the judgment of the Circuit Court for Baltimore City.

## FACTS

CPPA is a nonprofit physicians professional association which, at the time of the events giving rise to the underlying litigation, provided administrative support services and administrative management to health care provider organizations. CHP is a Maryland health maintenance organization. In 1984 and 1985, Chesapeake Administrative Services, Inc. (CAS) was a wholly owned subsidiary of CPPA and provided services to CHP, pursuant to an agreement under which CHP agreed to pay CAS for administrative and billing services. Effective July 1, 1985, CPPA divested itself of all interest in CAS. In November, 1986, CAS changed its name to MEDCO.

Beginning in January, 1982, Home issued a series of Business Owners policies to CPPA. By endorsement, CAS and CHP were added to these policies as additional insureds, with the same coverage as CPPA. In the exclusions provisions of the policies, Home specifically excluded cer-

tain types of damages and claims from its broad comprehensive general liability (CGL) coverage. One of the specific exclusions in the Chesapeake companies' policies was claims based on the rendering or failure to render professional services, while the definition of "occurrence" under the policy specifically excluded intentional wrongful conduct or conduct whose consequences were known or expected. Along with the insurance policies themselves, Home issued a Liability Limitation Endorsement to its CGL coverage, which is central to the dispute in this case. As amended, the coverage provision read as follows:

"The company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of

bodily injury or

property damage

to which this insurance applies, caused by an occurrence *and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental thereto,* and the company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient...." (Amended language emphasized.)

Home contends that this language amounted to a limited premises liability coverage. The Chesapeake companies, on the other hand, contend that business operations conducted on or from the premises were covered under this language.

In January, 1988, Joyce Wilson, on behalf of herself, the estate of her husband Hugh Wilson, and her children, Erica and Michelle Wilson, filed a complaint against CHP in the Circuit Court for Baltimore City. The complaint stated claims for fraud, negligent misrepresentation, negligence, intentional infliction of emotional distress, breach of con-

tract, breach of the duty of good faith and fair dealing, and wrongful death. The complaint alleged, in essence, that CHP and/or its employees had misrepresented the scope of its coverage for liver transplants, causing Hugh Wilson to be denied admission to a Pittsburgh hospital for liver transplant surgery. Before alternative financial arrangements could be made or another liver obtained, Hugh Wilson died. On August 11, 1988, Joyce Wilson filed an amended complaint, naming as additional defendants CPPA, MEDCO, and other entities not relevant to this case.

On August 25, 1988, CPPA and MEDCO provided notice of the *Wilson* litigation to Home's authorized agent, along with a demand that Home undertake their defense. A week later, the agent informed CPPA and MEDCO that the Business Owners policies only provided property and premises liability.

On March 17, 1989, the Circuit Court dismissed 25 of the 37 counts of the amended *Wilson* complaint. The 12 remaining counts alleged both intentional and negligent acts by the Chesapeake companies, in several cases in the alternative. In a letter dated July 31, 1989, counsel for CPPA and MEDCO submitted a copy of one of the Business Owners policies directly to Home and repeated the demand that Home undertake defense of the case. In a letter dated August 24, 1989, Home refused to undertake the defense of the Chesapeake companies. At that time, Home relied on two reasons for its refusal: (1) the definition of "occurrence" under the Chesapeake companies' policies; and (2) the exclusion of coverage of damages arising from the rendering of professional services.

On October 27, 1989, counsel for CPPA and MEDCO again sent a letter to Home, demanding that Home undertake the defense of the *Wilson* litigation. On January 17, 1990, Home reiterated its position that no coverage was available under its policies. No legal or factual basis for this determination was provided in the January 17 letter, however.

On April 5, 1990, the Chesapeake companies filed a Complaint for Declaratory Judgment, seeking a declaration: (1) that Home had an obligation to provide a defense to the *Wilson* litigation; (2) that Home had an obligation to indemnify the Chesapeake companies for any judgment against them based on negligence; and (3) that the Chesapeake companies were entitled to reimbursement of costs expended in defending the *Wilson* litigation and bringing the declaratory judgment action.

In the declaratory judgment action, both Home and the Chesapeake companies filed motions for summary judgment. Initially, the trial judge denied both motions, ruling that the relevant policy provisions were ambiguous. Subsequently, the trial judge, sitting without a jury, heard testimony on the parties' intent. In his order, however, the trial judge found that the extrinsic evidence of intent "was not helpful," and proceeded to interpret the policy provisions as a matter of law. He ruled that the liability limitation endorsement set forth above converted the CGL coverage to premises liability, and that the *Wilson* complaint therefore did not state a claim covered by the Chesapeake companies' policies with Home. The Chesapeake companies then appealed to this Court.

## INTERPRETATION OF THE POLICIES

In *St. Paul Fire & Marine Insurance Co. v. Pryseski*, 292 Md. 187, 438 A.2d 282 (1981) and *Brohawn v. Transamerica Insurance Co.*, 276 Md. 396, 347 A.2d 842 (1975), the Court of Appeals established a two-part test for determining an insurer's duty to defend its insured. In *Brohawn*, the Court of Appeals held:

> "The obligation of an insurer to defend its insured under a contract provision such as here involved is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend."

*Brohawn,* 276 Md. at 407, 347 A.2d 842. In that case, suit was brought against Brohawn, alleging assault (an intentional tort), or, in the alternative, negligence. The insurer filed a declaratory judgment action, seeking to avoid fulfilling its duty to defend on the grounds that its independent investigation of the circumstances of the tort claim led it to conclude that the insured had committed an intentional tort, which was explicitly excluded from coverage under the insurance policy. *Brohawn,* 276 Md. at 401, 347 A.2d 842. The Court of Appeals held that, where the issues sought to be resolved in the declaratory judgment action are the same as the ultimate issues in the tort suit, a declaratory judgment action is inappropriate. *Brohawn,* 276 Md. at 405–406, 347 A.2d 842.

In *Pryseski,* the Court of Appeals distinguished the question raised in *Brohawn* from the question of the extent of coverage provided by the insurance policy itself:

"In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit."

*Pryseski,* 292 Md. at 193, 438 A.2d 282. The second, or "potentiality" question, follows the principles set forth in *Brohawn,* discussed above. The first question that must be answered, however, before ever reaching the "potentiality" issue, is the determination of the actual coverage provided by the terms of the insurance policy itself. This analysis is made without reference to the allegations of the tort suit; it is simply a question of interpreting the insurance policy, applying basic contract rules of interpretation.

"[I]n a declaratory judgment action like the instant one, presenting an independent coverage issue under the

terms of the policy, it is the function of the court to interpret the policy and decide whether or not there is coverage. If such a coverage issue depends upon language of the policy which is ambiguous, the court in the declaratory judgment action nevertheless must resolve that ambiguity in favor of the insured before it can conclude that the insurer has or had an obligation to provide a tort defense."

*Pryseski,* 292 Md. at 194, 438 A.2d 282.

In *Allstate Insurance Co. v. Atwood,* 319 Md. 247, 572 A.2d 154 (1990), the Court of Appeals created an exception to the *Brohawn* general rule against an insurer litigating an issue also present in the underlying tort suit. In *Atwood,* Allstate had a contract with Atwood, whereby it had a duty to defend. The contract, however, specifically excluded intentional conduct. In the underlying tort suit, the issue of negligent versus intentional conduct, by tacit agreement of the plaintiff and defendant, was never truly litigated. The Court of Appeals held:

"Where ... the issue was not fairly litigated in the tort trial, considerations of public policy and fairness militate against holding that the insurer is bound by the outcome of the tort case. When, at the tort trial, there is nondisclosure of the actual facts, in an obvious effort to bring within insurance coverage a matter which is outside of that coverage, public policy is clearly offended. To take any other position would be to promote fraud and collusion. If the effect of the tactics of both sides in a tort trial, which is supposed to be an adversarial undertaking, is to cooperate in persuading a jury that intentional wrongful conduct is mere 'negligence,' the administration of justice is subverted."

*Atwood,* 319 Md. at 262–63, 572 A.2d 154. Thus, the Court of Appeals held that, in limited circumstances, an insurer may intervene, after the completion of the tort trial, to assert that the conduct of its insured was excluded from coverage. *Atwood,* 319 Md. at 264, 572 A.2d 154.

The *Atwood* exception does not apply in this case. Here, the Chesapeake companies and Home are seeking to litigate a coverage question wholly apart from the underlying tort suit brought by Wilson. This kind of declaratory judgment is of the type envisioned by the Court of Appeals in *Pryseski* and *Brohawn. Pryseski*, 292 Md. at 194, 438 A.2d 282 ("[W]hen the question of coverage or defenses under the language or requirements of the insurance policy is *separate and distinct* from the issues involved in the tort suit, the 'potentiality rule' ... has no application.") (Emphasis added)); *Brohawn*, 276 Md. at 405, 347 A.2d 842 ("A declaratory judgment action prior to the trial of a tort action against the insured may under some circumstances be a valuable means of resolving questions of policy coverage where those questions are *independent and separable* from the claims asserted in a pending suit by an injured third party.") (Emphasis added)).

As *Pryseski* and *Brohawn* make clear, our first task is to interpret the insurance policy to determine the extent of coverage. Once that determination is made, our attention then turns to the "potentiality" rule set forth in *Brohawn*. In other words, the potentiality evaluation is made in light of the coverage determination.

In *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 488 A.2d 486 (1985), the Court of Appeals set forth the basic principles governing the interpretation of an insurance policy:

"Construction of insurance contracts in Maryland is governed by a few well-established principles. An insurance contract, like any other contract, is measured by its terms unless a statute, a regulation, or public policy is violated thereby. To determine the intention of the parties to the insurance contract, which is the point of the whole analysis, we construe the instrument as a whole. Maryland courts should examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution."

*Pacific Indemnity,* 302 Md. at 388, 488 A.2d 486 (citations omitted). The Court of Appeals in *Pacific Indemnity* enunciated two other principles which guide our analysis in the instant case: first, "we accord words their ordinary and accepted meanings. The test is what meaning a reasonably prudent layperson would attach to the term." *Pacific Indemnity,* 302 Md. at 388, 488 A.2d 486. Second, "the inquiry is confined to analysis of the language used." *Pacific Indemnity,* 302 Md. at 389, 488 A.2d 486.

Applying these principles to the instant case, we hold that appellants' insurance policies with appellee were premises liability policies. The key language, as we have described it above, is "and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental thereto." Appellants contend that the phrase "operations necessary or incidental thereto" modifies the word "premises." Thus, they argue, all operations necessary or incidental to the declared use of the premises are covered by this policy. Because appellants declared that they would use the insured premises to manage a health maintenance organization (HMO), the management of the HMO is an "operation necessary or incidental" to the declared use of the premises. Appellants cite cases from several states which hold that operations necessary or incidental to the declared use of the premises are covered under the type of business operations policy they argue exists here. *See Reed Roller Bit Co. v. Pacific Employers Ins. Co.,* 198 F.2d 1, 2 (5th Cir.1952), *cert. denied,* 344 U.S. 920, 73 S.Ct. 386, 97 L.Ed. 709 (1953); *United States Fidelity & Guar. Co. v. Birmingham Oxygen Serv., Inc.,* 290 Ala. 149, 274 So.2d 615, 618–19 (1973); *Hale v. Fireman's Fund Ins. Co.,* 731 P.2d 577, 579–80 (Alaska 1987); *Sun Ins. Co. of New York v. Hamanne,* 113 N.H. 319, 306 A.2d 786, 788–89 (1973); *Lessak v. Metropolitan Casualty Ins. Co. of New York,* 106 Ohio App. 179, 153 N.E.2d 787, 791–792 (1957), *aff'd,* 168 Ohio St. 153, 5 O.O.2d 442, 151 N.E.2d 730 (1958); *but see Hall v. North East Ins.*

*Co.*, 507 So.2d 255, 257 (La.App.1987); *Harvey v. Mr. Lynn's, Inc.*, 416 So.2d 960, 962 (La.App.1982).

While the cases cited by appellants might be persuasive in other contexts, they are inapplicable to this case because we reject appellants' initial premise: in the language of the liability limitation endorsement set forth above, "operations necessary or incidental thereto" modifies not "premises" but "ownership, maintenance, or use *of* the premises." (Emphasis added.) Thus, the coverage afforded by the policy extends to claims arising from the "ownership, maintenance or use" of the property, and "operations necessary or incidental" to the "ownership, maintenance or use" of the property.

This conclusion, based on the linguistic structure of the policy language, is reinforced by other portions of the insurance policy. While appellants place great emphasis on the title of the declarations page, "Business Owner's Policy," and on the heading "Description and Location of Property and Operations Covered," appellants fail to address three other points which are fatal to their claim. First, under the title "Description and Locations of Property and Operations Covered," the only notation is the word "Office." If appellee had undertaken to cover all operations "necessary or incidental" to the use of the property, it would seem logical that some more precise definition of the types of operations covered would have been included in the declarations page. Second, the premiums for the insurance policies at issue here were calculated, not on the basis of certain types of risks, but on the square footage of the properties and premises covered. Again, this strongly suggests that "premises" liability, rather than a more expansive "operations" liability was intended by the parties to be covered by the insurance policies.

Finally, and perhaps most important, certain language extensively relied upon by appellants must be interpreted in light of the usual manner in which insurance policies are generated. As explained by counsel for appellee at oral argument, insurance policies themselves are not individually

tailored to each particular customer. In drafting the policy itself, insurance companies start with the most expansive coverage, and then proceed to exclude certain items from coverage, using exclusionary language that is tailored to the particular customer, in the form of liability limitation endorsements. Thus, when liability limitation endorsements are drafted contemporaneously with the policy itself, the standard insurance policy language must be read in conjunction with, not in isolation from, the liability limitation endorsements.

In this case, the liability limitation endorsement, adding the critical language discussed above to what was admittedly labeled "Comprehensive General Liability" coverage, was always part of appellants' insurance policies with appellee; there was never a time when the analyzed language was not part of the policy. Therefore, in this context, it is clear from the policies, read in conjunction with the liability limitation endorsements and other exclusions, that appellants never had CGL coverage; what they had, at all times, was a more limited form of premises liability.

## THE *WILSON* COMPLAINT

Having held that the insurance policies between appellants and appellee provided premises liability coverage only, as we have defined it above, we must now determine, in accordance with *Brohawn* and *Pryseski*, whether the *Wilson* complaint "potentially" alleges torts which come within the coverage we have defined. Based on our review of the allegations of the *Wilson* suit, we hold that there is no potentiality that those allegations are within the coverage of the insurance policies between appellants and appellee; we therefore hold that the trial judge correctly ruled that appellee had no duty to defend appellants against the *Wilson* litigation.

In *Pryseski*, 292 Md. at 195–96, 438 A.2d 282, the Court of Appeals distinguished between the interpretation of the insurance coverage, which, as discussed above, is a separate

and distinct issue not subject to the general rule against declaratory judgments, from determinations which are at issue in the underlying tort suit and which are subject to the potentiality rule:

"A case very similar to the present one is *Truck Ins. Exch. v. Marks Rentals*, [288 Md. 428, 418 A.2d 1187 (1980)]. There, the insured operated a franchised car rental business, and the liability insurance policy covered automobiles which the insured 'may rent to others, or operate under his ... rent-a-car franchise.' 288 Md. at 431, 418 A.2d 1187. An employee of the insured, driving her own automobile, was involved in an accident which injured someone else. The injured party brought a tort suit against the employee in which the insured employer was later added as a defendant. It was alleged in the tort suit that the employee was acting in the scope of her employment. After the insurance company refused to provide the insured employer with a defense in the tort case, the insured brought a declaratory judgment action against the insurer. As in the case at bar, there were two issues relating to coverage: (1) whether the employee was acting in the scope of her employment, and (2) if she was so acting, whether her automobile was being 'operate[d]' under the car rental franchise within the meaning of the policy's coverage clause. This Court assumed for purposes of the declaratory judgment action that the employee was acting in the scope of her employment, pointing out that this issue 'is one which must be resolved in the underlying tort suit,' 288 Md., *id.* at 430, n. 1, 418 A.2d 1187. We then proceeded to construe the terms of the policy covering vehicles which the insured 'operate[s] under his ... rent-a-car franchise,' [288 Md.] at 431–436, 418 A.2d 1187."

*Pryseski*, 292 Md. at 195–96, 438 A.2d 282. The Court of Appeals then concluded that "[l]ike the policy language in *Truck Ins. Exch.*, the meaning of the coverage terms in the [insurance] policy was an issue to be resolved in the present litigation." *Pryseski*, 292 Md. at 196, 438 A.2d 282.

■ Thus, as discussed above, while coverage questions may be litigated in a separate declaratory judgment action, issues which will be determined in the underlying tort litigation may not. If there is any scenario in which the allegations of the *Wilson* complaint will result in Home being required to cover the Chesapeake companies under their insurance policies, such issues may not be determined in this declaratory judgment action, but must be resolved in favor of the insured, pending the outcome of the underlying tort litigation.

The *Wilson* complaint alleges a series of misrepresentations, pled alternatively as intentional or negligent, by one or more of appellants. Appellants contended, under their interpretation of the insurance policies, that, because the management of an HMO was part of the declared use of the premises, clerical or administrative negligence of the type alleged by Wilson fell within the coverage of the policies. We have already held that the coverage of the insurance policies does not extend as far as appellants contended. The question, therefore, is whether the allegations of the *Wilson* complaint allege actions which would come under a premises liability policy. Appellants have offered no argument in support of a "yes" answer to this question; our review of the complaint reveals that there is no evidence to suggest such a response. We therefore hold that appellee did not breach its duty to defend appellants under their insurance policy, because no duty to defend was raised by the *Wilson* complaint. The judgment of the Circuit Court for Baltimore City is therefore affirmed.

JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.