USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 94-2004 GRE INSURANCE GROUP  D/B/A ATLAS ASSURANCE COMPANY OF AMERICA, Plaintiff, Appellee, v. METROPOLITAN BOSTON HOUSING PARTNERSHIP, INC., Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ___________________ ____________________ Before Cyr, Circuit Judge, _____________ Coffin and Bownes, Senior Circuit Judges. _____________________ ____________________ Joseph G. Blute with whom Jonathan Z. Pearlson and Robert Quinn ________________ _____________________ ____________ were on brief for appellant. Daniel P. Carter with whom Michael R. Luongo and Jayne Conroy _________________ __________________ _____________ were on brief for appellee. ____________________ July 25, 1995 ____________________ COFFIN, Senior Circuit Judge. This appeal raises the ______________________ question whether an insurance carrier has a duty to defend and indemnify its insured against lawsuits currently pending in Massachusetts courts under two Comprehensive General Liability insurance policies. The district court granted summary judgment in favor of the carrier, and the insured appeals. Concluding, on the present state of the record, that the carrier must fulfill the first of these duties, i.e., the duty to defend the lawsuits, we reverse and remand. I. Background __________ Appellee GRE Insurance Group (GRE) sold the two policies at issue here to appellant Metropolitan Boston Housing Partnership, Inc. (Metropolitan), and one of its predecessor entities, Metropolitan Housing, Inc. (MHI). Metropolitan, like MHI before it, disburses federal and state housing subsidies to participating landlords and tenants.1 Metropolitan issues Certificates of Participation to eligible tenants, who then search the private rental housing market. Once a tenant locates a suitable unit, Metropolitan steps in and negotiates the rent with the property's landlord. Metropolitan and the landlord then enter into an agreement regarding the payment of rent subsidies, and the tenant and landlord sign a lease. Metropolitan never  ____________________ 1 MHI and Metropolitan were formed to privatize the functions previously performed by the Metropolitan Housing Assistance Program of the Massachusetts Executive Office of Communities and Development. -2- becomes a party to the lease, nor acquires any possessory interest in the apartments. Before agreeing to subsidize a particular apartment, Metropolitan inspects the premises to insure that federal Housing Quality Standards are satisfied. A Metropolitan representative visits the apartment and, after visual inspection, completes a checklist confirming the number and types of rooms, whether sinks, stoves, and refrigerators are in working order, and so forth. Metropolitan's inspectors never test for the presence of lead paint. Instead, they simply note whether the paint is chipped or peeling, and whether the landlord has a Letter of Compliance from a licensed lead paint inspector attesting to lead paint safety. If no letter is on file, the landlord is told that one is required before the subsidy will be given. Despite this rather limited role, Metropolitan has been named as a defendant or third party defendant in five Massachusetts state lawsuits alleging personal injury due to lead paint exposure of minors at Metropolitan-subsidized apartments. These suits assert a number of different legal theories against Metropolitan, many of which are based on its alleged failure to inspect adequately for lead paint before agreeing to subsidize the apartments. GRE filed this diversity action seeking a declaratory judgment that it had no obligation to defend or indemnify Metropolitan against the lawsuits, and the district court granted summary judgment in its favor. Metropolitan now appeals. -3- II. Analysis ________ We review de novo the district court's interpretation of ________ these insurance contracts, St. Paul Fire and Marine Ins. Co. v. ___________________________________ Warwick Dyeing Corp., 26 F.3d 1195, 1199 (1st Cir. 1994), guided _____________________ by several familiar rules of construction.2 We begin with the actual language of the policies and consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Trustees of Tufts Univ. v. Commercial ________________________ __________ Union Ins. Co., 415 Mass. 844, 849, 616 N.E.2d 68, 72 (1993) _______________ (quoting Hazen Paper Co. v. United States Fidelity & Guaranty ________________ ___________________________________ Co., 407 Mass. 689, 700, 555 N.E.2d 576, 583 (1990)). Absent ___ ambiguity, we give policy language its plain and ordinary meaning. E.g., Cody v. Connecticut General Life Ins. Co., 387 ____ ____ __________________________________ Mass. 142, 146, 439 N.E.2d 234, 237 (1982). Ambiguities are resolved against the insurer, who drafted the policy, and in favor of the insured. Thus, if "there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it." Hazen, 407 _____ Mass. at 700, 555 N.E.2d at 583. The insured bears the initial burden of proving that a claim falls within the grant of coverage, which, once established, shifts the burden onto the insurer to show the applicability of any exclusion. Camp Dresser ____________ & McKee, Inc. v. Home Ins. Co., 30 Mass. App. Ct. 318, 321, 568 _____________ ______________ N.E.2d 631, 633 (1991).  ____________________ 2 The parties agree that Massachusetts law controls. -4- To determine if a liability policy obligates a carrier to defend claims made against its insured, we simply compare the underlying complaint to the policy; "if the allegations of the complaint are `reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense." Liberty Mut. Ins. Co. v. ______________________ SCA Services, Inc., 412 Mass. 330, 331-32, 588 N.E.2d 1346, 1347 ___________________ (1992) (quoting Continental Cas. Co. v. Gilbane Bldg. Co., 391 _____________________ __________________ Mass. 143, 146, 461 N.E.2d 209, 212 (1984)) (internal quotation omitted). At issue here are two combined comprehensive general liability and commercial property insurance policies. In the Insuring Agreement of the general liability coverage part, GRE promised to: pay those sums that [Metropolitan] becomes legally obligated to pay as damages because of `bodily injury' . . . to which this insurance applies. . . . The `bodily injury'. . . must be caused by an `occurrence.' The `occurrence' must take place in the `coverage territory.' We will have the right and duty to defend any `suit' seeking those damages. There is no question that the terms `occurrence' and `bodily injury' are defined in such a way as to cover personal injury due to lead paint exposure, and that the occurrences took place within the relevant coverage territory. Thus, unless a policy exclusion effectively defeats this grant of coverage, GRE is obligated to defend and indemnify the underlying lawsuits against Metropolitan. The district court relied upon two grounds, both of which GRE urges upon us, for holding that there is no coverage: first, that the policies are restricted to liability arising at -5- Metropolitan's home office; and second, that the underlying claims fall within a policy exclusion relating to inspection services. We examine these propositions in turn. A. Was Coverage Limited to Metropolitan's Office? _____________________________________________ GRE argues that the policy does not apply to liability for claims arising from Metropolitan's activities away from its home office, relying upon language in the policy's Declarations form and two supplemental schedules, and upon the amount of the premium, which the district court found to be too low conceivably to reflect the parties' intent to cover additional risks.  As for the policy language, the "Common Policy Declarations Form" lists certain basic information about the policy, such as the types of coverage purchased, the premium for each coverage part, the coverage period, the name, address and type of business of the insured, the policy number, and so forth. It also contains the operative sentence: "In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy." GRE seizes on the fact that the next line of the form calls for a "business description" of the insured, which is listed as "office," as evidence that only liability arising from Metropolitan's office operations was covered. The flaw in this reasoning is that the question calls for a description of the insured's type of business, not the premises or building to which ____ insurance was to be limited. The fact that Metropolitan operated as an office, rather than a hockey rink, manufacturing plant, or -6- boarding house, was obviously relevant to coverage. But it does not show a clear understanding to restrict coverage to liability arising out of Metropolitan's office only. A somewhat closer question is presented by language that appears in the insurance schedules. The "Comprehensive General Liability Coverage Declarations Form" directs the reader to "refer to [the] common policy premises schedule for a description and location of all premises owned, rented or controlled by the named insured." The "Common Policy Premises Schedule," under the heading "Premises," lists "434 Massachusetts Avenue, Boston, MA," i.e., the location of Metropolitan's office. Further, on the "Comprehensive General Liability Insurance Supplemental Schedule," the "Description of Hazards Classification" is listed as "Buildings or Premises -- Office," and the "Exposure" is listed as "15,000" square feet, roughly the area of Metropolitan's office. GRE argues that this shows that only those risks arising out of Metropolitan's office activities were covered. Based on a recent decision of the Supreme Judicial Court of Massachusetts, however, we cannot agree. In Trustees of Tufts __________________ University v. Commercial Union Ins. Co., the insurance carrier __________ __________________________ argued that the failure to include a certain risk on the schedule of hazards to a comprehensive general liability insurance policy removed any coverage for that risk. The SJC rejected that argument, holding simply that "nowhere does the policy unambiguously provide that coverage is limited to the specific -7- hazards listed in the schedule." 415 Mass. at 856, 616 N.E.2d at 76. In the instant case, there is no language in the policy clearly indicating that liability insurance is limited to claims arising from occurrences at the premises listed on the schedules from which we have quoted.3 This absence is made even more probative when compared to the presence of such language on both the coverage grant description and the declarations form for the property coverage part of the policy. The grant of coverage on ________ the property part states that: "We will pay for direct physical loss of or damage to Covered Property at the premises described __________________________ in the Declarations caused by or resulting from any Covered Cause ___________________ of Loss" (emphasis added). The property declarations form, under the heading "Coverages Provided," states that the insurance "applies only to the premises shown below, and with respect to those premises, only for the coverages, causes of loss and limits shown." By reference to the common premises schedule, the "premises shown below" is Metropolitan's office space. The failure to include such language anywhere in the liability _________ coverage part, under Tufts, is fatal to GRE's claim that its _____ comprehensive liability insurance was converted into a premises-  ____________________ 3 We reject GRE's citation to the "products-completed operations hazard" exclusion as a sufficiently unambiguous statement of such a limitation. As GRE recognized at oral argument, that provision applies when a completed product causes injury or property damage after it leaves the hands of its manufacturer. It excludes from coverage liability that arises after an insured's operations are completed, not, as here, from the insured's operations themselves. -8- only liability policy simply by listing a certain premise on the schedule of hazards. Several other considerations support our conclusion that the liability insurance was not limited to occurrences at Metropolitan's office. First, for an additional premium, Metropolitan purchased a so-called "Broad Form Comprehensive Liability" endorsement for the 1990-91 policy, which was incorporated into the 1991-92 policy. This endorsement expanded the coverage territory to "anywhere in the world with respect to _____________________ [injuries] arising out of the activities of [the] insured" (emphasis added). We find it quite unlikely that parties who intended coverage only for activities at Metropolitan's home office at 434 Massachusetts Avenue in Boston would have bought and sold such an endorsement. Certainly, an "objectively reasonable insured, reading [this] policy language, would expect to be covered" for liability beyond that arising at its home office. Tufts, 415 Mass. at 849, 616 N.E.2d at 72. _____ Second, as part of its application for insurance, Metropolitan, through its broker, made a specific point of telling GRE that it hired outside "inspectors" to go to the apartments and determine whether they satisfied the relevant federal standards so as to qualify for the subsidy. Having received this information, GRE sold Metropolitan policies that, as their titles made clear, purported to cover "comprehensive general liability." Thus, absent express exclusionary language, -9- it was reasonable for Metropolitan to believe that its coverage included the inspectors' activities. Indeed, as we find infra, there was an endorsement, the _____ professional services exclusion, which may indeed have been added in an attempt to exclude from the grant of coverage any liability arising from the inspectors' activities. Among other things, that endorsement expressly excluded from coverage any claims "arising out of the rendering or failure to render any professional services . . . including . . . inspection . . . services." If coverage were given only to Metropolitan's office activities in the first place, there would have been no reason to add this exclusion.  The district court also gave weight to the relatively small amount of the premium as evidence that no more than Metropolitan's office activities were covered. While we also find the premium to be relatively low, we do not believe the amount of the premium to be dispositive. First, if GRE wanted to press this argument seriously, it could have submitted expert testimony regarding the premium amount here versus premiums charged for comparable risks. Instead, on this record, there is no factual basis whatsoever upon which to assess whether the premium is low or high for the covered risks. More importantly, we can speculate as to many reasons for the low premium. GRE may have concluded that Metropolitan faced very little liability exposure because it was essentially a disbursing agent for government funds, which, even including the -10- apartment inspections, may not have been seen as an enterprise generating large risks. Or, GRE's calculus of low exposure may have been influenced by a Massachusetts statute, Mass. Gen. L. ch. 231 85K, which limits liability of non-profit organizations to a $20,000 per claim cap. Or, it could have calculated the premium erroneously, overlooking the apartment inspection aspect of Metropolitan's operations. Thus, without a fact finding on the circumstances surrounding premium calculation based on competent evidence, our general view is that the amount of the premium will rarely be dispositive in determining the extent of coverage, for such a rule would allow poor estimates of risk, or calculations of risk based upon mathematical error, to supersede the actual coverage to which parties agreed. Neither of the cases relied upon by the district court is to the contrary. In Chesapeake Physicians Prof. Ass. v. The Home _________________________________ ________ Ins. Co., 92 Md. App. 385, 608 A.2d 822 (1992), the court was ________ faced with a question similar to ours -- whether a comprehensive general liability insurance policy was in fact limited to cover only certain premises -- and determined that it was. But that court's holding was based upon the fact that the policy language itself clearly limited coverage to the premises in question. The "key language" was the carrier's promise to indemnify and defend all claims "arising out of the ownership, maintenance, or use of __ the insured premises and all operations incidental thereto." Id. ____________________ ___ at 394, 608 A.2d at 826 (emphasis added). As we have noted, GRE's liability policies have a conspicuous lack of such express -11- language limiting coverage to Metropolitan's office. It is true that the Chesapeake court went on to discuss a number of __________ considerations that buttressed its decision, one of which was the fact, also present in our case, that the premium was calculated based on the square footage of the properties and premises covered. But, as this was in the context of a policy that unambiguously limited coverage to certain premises by its express terms, it has little, if any, relevance to interpreting the meaning of the instant policy -- particularly after the SJC decision in Tufts. _____ The second case, Rumford Property and Liability Ins. Co. v. ________________________________________ Carbone, 590 A.2d 398 (R.I. 1991), is even less persuasive. In _______ Rumford, the insurance company had argued that the relatively low _______ premium and the use of only certain square footage to calculate the premium showed that only certain premises were covered. The trial court rejected that argument, a ruling from which the ________ insurance company did not even appeal. Instead, the only issue on appeal was the insurance company's alleged bad faith in refusing to provide coverage. In the context of resolving that issue, the Supreme Court of Rhode Island stated that the low premium and the square footage calculation created "at least an arguable basis for denying coverage." Since the insurance company's contention was "not a frivolous one," its conduct of refusing to defend and indemnify, "while certainly not exemplary, . . . failed to reach the level of bad faith." Id. at 400-01. ___ -12- Thus, neither Rumford nor Chesapeake persuade us that the amount _______ __________ of the premium is highly probative in this case. B. The Professional Services Exclusion ___________________________________ Each policy contains a professional services exclusion, which removes from coverage liability "arising out of the rendering or failure to render any professional services by or for you, including . . . supervisory, inspection or engineering services." The district court found that this endorsement "plainly omits coverage for any inspection service (however ___ `professional' it might be)." GRE Ins. Group v. Metropolitan _______________ ____________ Boston Housing Part., Inc., No. 93-11727-RGS, slip op. at 6 (D. __________________________ Mass. Aug. 11, 1994). We disagree. By its own plain terms, the endorsement excludes coverage for a broad category -- professional services - - and then specifies types of excluded professional services as examples. The examples themselves cannot be broader than the category they exemplify; they are nothing more than subsets of "professional services." Thus, only inspections that are "professional," as opposed to "nonprofessional," fall within the endorsement. See Atlantic Mut. Ins. Co. v. McFadden, 413 Mass. ___ _______________________ ________ 90, 92, 95, 595 N.E.2d 762, 764, 765 (1992) (employing similar reasoning in finding that lead paint exposure was not within pollution exclusion, which defined pollutant as "any contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," because of additional requirement of "discharge, dispersal, release or escape" of pollutant). -13- In Roe v. Federal Ins. Co., 412 Mass. 43, 587 N.E.2d 214 ___ _________________ (1992), the Supreme Judicial Court applied a formulation for assessing the applicability of a professional services exclusion that we find instructive in the instant case. To be engaged in professional services,  "[s]omething more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term `professional' . . . means something more than mere proficiency in the performance of a task and implies intellectual skill . . . . A `professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. . . . In determining whether a particular act is . . . a `professional service' we must look not to the title or character of the party performing the act, but to the act itself."  412 Mass. at 48, 587 N.E.2d at 217 (quoting Marx v. Hartford Acc. ____ _____________ & Indem. Co., 183 Neb. 12, 13, 157 N.W.2d 870, 872 (1968) ______________ (citations omitted)). The cases collected in Roe all analyze the ___ applicability of professional services exclusions by determining whether the relevant activity was "professional" in nature. See ___ Harad v. Aetna Cas. & Sur. Co., 839 F.2d 979, 984 (3d Cir. 1988) _____ _____________________ (professional services exclusion applies to attorney's preparation and filing of pleadings); Curtis Ambulance v. Shawnee ________________ _______ County Bd. of County Comm'rs., 811 F.2d 1371, 1379-84 (10th Cir. ______________________________ 1987) (professional services exclusion applies to ambulance personnel's provision of emergency medical services); Bank of ________ California, N.A. v. Opie, 663 F.2d 977, 981-82 (9th Cir. 1981) _________________ ____ (professional services exclusion applies to mortgage broker's management of loan proceeds). Therefore, we reverse the district -14- court's decision that all inspections were necessarily excluded under this endorsement, and remand for a determination of whether, under Massachusetts law, Metropolitan's inspectors performed professional services. Even if Metropolitan's inspections are found to be professional in nature, however, GRE would still have to defend the underlying lawsuits -- at least initially. This is so because, after reviewing the complaints filed against Metropolitan, we find that some of the claims raise legal theories of recovery broader than inadequate inspections. Taken collectively, the claims include negligence, negligent misrepresentation, negligently creating a lead paint risk, failing to require an owner to take corrective action, failing to correct a lead paint hazard, failure to obtain certificates of compliance with the lead paint law, and breach of contract and/or the implied covenant of habitability. At least on their face, these claims are "reasonably susceptible" of being read to "state or adumbrate" claims that are beyond the inspection services exclusion. Liberty Mutual, ______________ 412 Mass. at 330, 588 N.E.2d at 1347 (quoting Continental Cas., ________________ 391 Mass. at 146, 461 N.E.2d at 212). For example, the claimed failure to correct a lead paint risk appears to rest on the theory that the very provision of rent subsidies carried with it the responsibility to make whatever lead paint safety improvements were necessary. Other claims might be based on the theory that the inspections were all perfectly adequate, but -15- Metropolitan's follow up with the landlords was lacking. See ___ Sterilite Corp. v. Continental Cas. Co., 17 Mass. App. Ct. 316, _______________ _____________________ 318, 458 N.E.2d 338, 341 (1983) ("[T]he process is one of envisaging what kind of losses may be proved as lying within the ___ range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.") (emphasis added); cf. Complaint of Stone Petroleum Corp., 961 ___ ____________________________________ F.2d 90, 91-92 (5th Cir. 1992) (general liability insurer must defend suits because they contain claims that, liberally construed, are beyond the professional services exclusion). We express no view on whether such expansive theories ultimately will be successful against Metropolitan, and thus GRE.4  Therefore, because certain of the claims are not within the professional services exclusion, GRE is obligated to defend the underlying suits notwithstanding the possibility that certain other claims might be found to be excluded. See Camp Dresser, 30 ___ ____________ Mass. App. Ct. at 323, 568 N.E.2d at 634 (imposing a duty to defend despite the fact that "many of the complaint allegations fell within the exclusion"); see also Aetna Cas. & Surety Co. v. ___ ____ ________________________ Continental Cas. Co., 413 Mass. 730, 732 n.1, 604 N.E.2d 30, 32 ____________________ n.1 (1992) (noting that "the weight of authority places the duty to defend all counts on an insurer which has a duty to defend at least one count of a complaint"). As the Camp Dresser court ____________  ____________________ 4 Nor need we, for GRE agreed to defend suits within the grant of coverage "even if the allegations of the suit are groundless, false or fraudulent."  -16- indicated, an insurer in this position may "undertake the defense of the underlying action with a reservation of rights with respect to the excludable claims" or it may share respective defense responsibilities with co-counsel. 30 Mass. App. Ct. at 323 n.4, 568 N.E.2d at 634 n.4. III. Conclusion __________ If the inspections are found to fall within the professional services exclusion, GRE would be obligated to defend the suits against Metropolitan until the non-excludable claims are resolved,5 or an arrangement such as contemplated by the Camp ____ Dresser court is established, and would have to indemnify only if _______ Metropolitan were found liable on a non-excludable claim. If the inspections are found not to be professional services, GRE would have to defend the suits and indemnify Metropolitan for any successful claims. The judgment of the district court in favor of GRE is ____________________________________________________________ reversed. The case is remanded for entry of judgment in favor of _________________________________________________________________ Metropolitan on the duty to defend, and for a determination _________________________________________________________________ consistent with this opinion of whether Metropolitan's _________________________________________________________________  ____________________ 5 In this case, we would imagine that GRE could test the viability of those claims that do not rely exclusively on alleged inadequate inspections by way of early motion to dismiss or for summary judgment in the underlying state cases. If those claims were removed, it appears that GRE's obligation to defend the underlying cases would terminate. See Sterilite, 17 Mass. App. ___ _________ Ct. at 323-24 (the duty to defend ceases if and when the insurer demonstrates that no claim asserted within the grant of coverage can be successful in the underlying action); see also Lumbermans ___ ____ __________ Mut. Cas. Co. v. Belleville Ind., Inc., 407 Mass. 675, 685-86, ______________ ______________________ 555 N.E.2d 568, 575 (1990) (citing Sterilite approvingly). Of _________ course, we are not faced with these questions. -17- inspections were professional in nature. _______________________________________ -18-