Garsh, E. Susan, J.
INTRODUCTION
Plaintiff, Medical Professional Mutual Life Insurance Company (“ProMutual”), filed this suit seeking, in Count I, a declaration: (i) that ProMutual has no duty to defend or indemnify the defendant, Lester A. Steinberg, M.D. (“Steinberg”), against a medical malpractice suit brought by defendants David and Eleanor Margolis against Steinberg (the “Margolis Suit”); and (ii) that ProMutual may discontinue its participation in and funding of the defense of the Margolis Suit and seeking, in Count II, reimbursement for attorneys fees and expenses that already have been incurred by ProMutual in the defense of the Margolis Suit. The matter is now before the court on ProMutual’s motion for summary judgment on Count I. For the reasons set forth below, the plaintiffs motion for summary judgment is allowed.
BACKGROUND
The summary judgment record reveals the following facts, which either were not disputed in accordance with Superior Court Rule 9A(b)(5) or, if disputed in accordance with that rule, reflect the facts in the light most favorable to Steinberg.
In 1975, Steinberg purchased an individual claims-made professional liability policy from the Medical Malpractice Joint Underwriting Association (“MMJUA”), effective October 1, 1975 to October 1, 1976. The MMJUA and the Massachusetts Medical Professional Insurance Association are predecessors to ProMutual. Between October 1, 1975 and October 1, 2002, Steinberg was insured under a series of individual claims-made professional liability policies issued by ProMutual or its predecessors, renewed annually on October 1 of each year. Steinberg’s ProMutual claims-made medical malpractice coverage remained in effect until October 1, 2002. At all relevant times, Nixon Insurance Agency (“Nixon Insurance”) was Steinberg’s insurance broker.
From 1975 through January 2001, ProMutual’s medical malpractice policies consisted of four parts: (1) the policy jacket, (2) the coverage form, (3) a declaration page or renewal certificate, and (4) any endorsement to the policy. At all relevant times, it was ProMutual’s custom and practice to send two copies of the applicable policy jacket and coverage form to an insured’s broker when the insured first purchases a policy and to do the same whenever those documents are updated or revised. One copy is intended for the broker’s file, and the other is for the broker to send to the insured. The coverage form sent to Nixon Insurance in 1975, when Steinberg first purchased liability insurance from ProMutual, included the following provisions:
TO OUR POLICYHOLDER
This is a claims made policy. It covers claims arising from the performance of professional services subsequent to the retroactive date indicated and first brought against you while the policy is in force. Please review the policy carefully and discuss the coverage with your insurance agent.
A claim shall be considered to be first made when the company first receives written notice of the claim or occurrence.
3. REPORTING ENDORSEMENT
In the event of termination either by non-renewal or cancellation of this policy, or termination of a reporting period the insured shall have the right upon payment of an additional premium (to be *673 computed in accordance with the company’s rules, rates, rating plans and premiums applicable on the effective date of the endorsement) to have issued an endorsement(s) providing additional reporting periodos) in which claims otherwise covered by this policy may be reported. Such right hereunder must, however, be exercised by the insured by written notice not later than thirty (30) days after such termination date.
“[Reporting period" means the period of time stated in the reporting endorsement for reporting claims or suits arising out of professional services.
ProMutual revised or updated the coverage form for its claims-based individual professional liability policies in January 1990, April 1993 and May 1995. ProMutual sent two copies of the revised coverage forms to Steinberg’s broker, Nixon Insurance, in January 1990, April 1993 and May 1995. Steinberg himself did not personally receive copies of any of these revised coverage forms. The revised coverage forms issued in January 1990, April 1993 and May 1995 each include the following provisions:
TO OUR POLICYHOLDER
This is a claims made policy. It covers claims arising from the performance of professional services on or after the retroactive date indicated and first brought against you while the policy is in force, but only if the company first receives formal written notice of the claim from you or your agent during the policy period. This policy does not cover claims reported to the company after the expiration of the policy period. Therefore, when you terminate or fail to renew your claims made policy with the [company], it will be necessary to purchase a reporting endorsement to extend the period of coverage beyond the expiration date of the policy. Please review the policy carefully and discuss the coverage with your insurance agent.
3. REPORTING ENDORSEMENT
In the event of termination of insurance either by non-renewal or cancellation of this policy, or termination of a reporting period the named insured shall have the right upon payment of an additional premium (to be computed in accordance with the company’s rules, rates, rating plans and premiums applicable on the effective date of the endorsement) to have issued a reporting endorsement(s) providing additional reporting periodos) in which claims otherwise covered by this policy may be reported. Such right hereunder must, however, be exercised by the named insured by written notice no later than thirty (30) days after such termination date.
In January 2001, ProMutual again revised its claims-made individual professional liability policy, effective October 1,2001. Neither Nixon Insurance nor Steinberg received a copy of the revised policy. Drawing all inferences adverse to ProMutual, a fact finder could find- that the revised policy form was not forwarded to the broker or to Steinberg by Pro Mutual.
On or about August 26, 2002, Promutual sent to Nixon Insurance two copies of a Renewal Declaration for the 2002-2003 period. Steinberg received a copy of that Renewal Declaration. On or about September 3, 2002, ProMutual sent Steinberg, with a copy to Nixon Insurance, an invoice for the premium for the 2002-2003 policy period. Steinberg received this invoice. The invoice stated that payment of the premium for the 2002-2003 policy was due by October 3, 2002. At about the time Steinberg received the Renewal Declaration and invoice, he was unhappy with the premiums charged by ProMutual and with ProMutual’s settlement of a previous claim against him. Steinberg chose not to renew his ProMutual policy for the 2002-2003 period and deliberately did not pay any of the premium due for the 2002-2003 period. Steinberg informed Nixon Insurance that he was cancelling his coverage with ProMutual effective October 1, 2002. Steinberg purchased professional liability insurance for the 2002-2003 period from another insurance company, Controlled Risk Insurance Company (“CRICO”). ProMutual did not receive any payment from Steinberg toward the premium for the 2002-2003 policy period by October 3, 2002. Steinberg’s policy for the 2001-2002 period expired on October 1, 2002.
On or about October 8, 2002, ProMutual sent Steinberg, with a copy to Nixon Insurance, a Statement of Overdue Premium. Steinberg received this statement. ProMutual received no payment from Steinberg in response. On or about October 18, 2002, ProMutual sent Steinberg, with a copy to Nixon Insurance, a letter stating:
Please be advised that as of October 18, 2002, we have not received payment for the policy listed above. This letter serves as notification of intent to void renewal of this coverage for non-payment effective 10/01/2002, 12:01 a.m. standard time, if payment is not received by October 28, 2002.
(Emphasis in original.) Steinberg received this letter and did not send any premium payment in response. Thereafter, ProMutual voided Steinberg’s renewal policy as it had advised it would do.
At no time did Steinberg purchase a reporting endorsement from ProMutual to extend his period of coverage beyond the expiration of his 2001-2002 policy or notify ProMutual that he wished to do so. Neither Steinberg nor his broker received a “Notice of Cancellation” reminding him of his right to extend his coverage by purchase of a reporting endorsement until March 13, 2003, after the right to purchase such an endorsement had expired.
Internal underwriting rules adopted by ProMutual require it to notify its insured, by certified mail, of the *674 option to purchase a reporting endorsement whenever a claims-made policy is cancelled for any reason. The Underwriting Department of ProMutual adopted the procedure because in some states where it does business, such as Connecticut, a statute or regulation requires it to so notify its insureds. The Underwriting Department determined that, in the interests of simplifying procedures, rather than have a separate policy for each state, it would adopt a single procedure that met the requirements of those states that require such notice. Steinberg was not aware of the existence of ProMutual’s internal underwriting policy until after the commencement of this action.
On or about August 28, 2001, while his ProMutual policy was still in effect, Steinberg received a request for the records of a former patient, David Margolis (“Margolis”), from an attorney representing Margolis. As of October 1, 2002, Steinberg had not notified anyone other than Nancy Watson (“Watson”) of the request. Watson, who has been a partner at the law firm of Ficksman & Conley, LLP since 1990, was retained by ProMutual in February 2001 to defend Steinberg in a suit that had been filed against him by Robert Friedmann (the “Friedmann Suit”). ProMutual retained Watson to defend Steinberg in the Friedmann Suit pursuant to its duty under Steinberg’s 2001-2002 policy to defend Steinberg against claims made against him and reported to ProMutual while that policy was in effect. Watson has never been an employee or agent of ProMutual. Watson’s practice, when retained by ProMutual to represent an insured, was to introduce herself to the client as an attorney with the firm of Ficksman & Conley who has been retained by ProMutual to defend the client in a particular lawsuit. All of her written communications to Steinberg were on the letterhead of her law firm, and her telephone was always answered “Ficksman & Conley.” Several months before the records request made by Margolis’s attorney, Steinberg’s office administrator, Carol Farkas (“Farkas”), spoke with Watson in connection with the Friedmann Suit. At that time Watson told Farkas that she represented ProMutual and asked for some of Friedmann’s medical records in connection with that case. She introduced herself to Farkas, stating, “I’m from ProMutual for this case.” Watson also said to Farkas that “(i]f there’s anything, you know, any other information, anything that you need, please call me or get in touch with me.” In Farkas’s mind, “[Watson] was Promutual.” Because of what Watson had said to Farkas in the course of handling the Friedmann Suit, Farkas suggested to Steinberg that the records request from Margolis’s attorney be sent to Watson, and Steinberg agreed. Farkas then sent it to Watson by regular mail. Steinberg himself testified that he only knew that Watson had been involved in the Friedmann case “and that’s all I know about Nancy Watson and ProMutual.” Neither Watson nor anyone else at Ficksman & Conley ever forwarded the records request from Margolis’s attorney to ProMutual or notified ProMutual of its existence. ProMutual never authorized Watson to accept notice of claims or potential claims from insureds on ProMutual’s behalf.
The Margolis Suit was filed in January of 2003. Steinberg was served with a summons and amended complaint in the Margolis Suit on or about February 22, 2003. Steinberg did not send the summons or amended complaint to ProMutual. On or about March 4, 2003, ProMutual received the summons and amended complaint in the Margolis Suit from Risk Management Foundation (“RMF”), the claims handler for medical professionals insured by CRICO. ProMutual’s receipt of the documents from RMF was its first notice of the Margolis claim.
DISCUSSION
The hallmark of claims-made coverage, which Steinberg had with ProMutual from 1975 until he decided not to renew his coverage in the fall of 2002, is that it covers the insured only for claims made and reported to the insurer within the policy period or within any extended reporting period purchased by the insured, regardless of when the covered act or omission may have occurred. Chas. T. Main, Inc. v. Fireman’s Fund Insurance Co., 406 Mass. 862, 863-64 (1990). Summaiy judgment is appropriate where, as here, the facts, viewed in a light most favorable to the opposing party, demonstrate that the liability insurer has no obligation to defend or indemnify an insured against a third-party claim because such claim “could not result in a liability for which coverage was provided.” Peerless Insurance Co. v. Hartford Insurance Co., 48 Mass.App.Ct. 551, 555 (2000).
Termination of ProMutual Policy
Steinberg’s contention that ProMutual’s policy may have extended beyond October 1, 2002 because of his late receipt of a notice of cancellation of the 2002-2003 renewal policy is belied by the undisputed facts in the record. That Steinberg may not have received a notice of cancellation from ProMutual until March 13, 2003 does not alter the undisputed fact that his ProMutual 2001-2002 coverage lapsed by its terms at the expiration of the policy period and that the 2002-2003 coverage never was effective because Steinberg rejected the renewal coverage offered to him.
After receiving a renewal declaration and invoice for premiums on the 2002-2003 renewal policy, Steinberg consciously chose not to renew his ProMutual policy. He deliberately ignored clear notice that renewal of his 2001-2002 policy would be voided for non-payment effective October 1, 2002, if payment were not forthcoming by October 28, 2002. Steinberg had no intention of continuing his coverage with ProMutual beyond the 2001-2002 policy term and, accordingly, obtained malpractice insurance from another insurance provider for the 2002-2003 period. “[W]here, as here, the insured has no intention of continuing coverage beyond the policy term, he is not covered beyond that term even if the insurer, ignorant of the insured’s *675 intention not to renew, issues a renewal policy. A policy so issued is regarded as an offer of a renewal contract, which must be accepted, by payment of the premium or promise to pay, express or implied, before coverage is in effect.” Commercial Union Insurance Co. v. Connors, 42 Mass.App.Ct. 538, 541-42 (1997). It is undisputed that ProMutual offered to renew Steinberg’s policy for the 2002-2003 period; Steinberg rejected this offer because he never paid the premium or promised, explicitly or implicitly, to pay the premium. Thus, there was no ProMutual insurance policy in effect when notice of the Margolis Suit was given to ProMutual in March of 2003.
Notice of the Margolis Claim
A policy that provides coverage on an occurrence basis applies “if the covered act or covered omission occurs within the policy period, regardless of the date of discoveiy.” Chas. T. Main, Inc., 406 Mass. at 863. Steinberg, however, never had an occurrence basis policy with ProMutual. The requirement in a claims-made policy that notice of a claim be given to the insurer during the policy period or shortly thereafter is “of the essence in determining whether coverage exists.” Id. at 865. Because Steinberg did not purchase a reporting endorsement from ProMutual to extend his coverage beyond October 1, 2002, the notice of the Margolis Suit provided to ProMutual in March of2003 is too late to obtain coverage under Steinberg’s ProMutual 2001-2002 policy.
The forwarding of the records request by Margolis’s attorney to Watson in September of2001 did not serve to put ProMutual on notice of the potential claim.[2] Assuming that Steinberg’s office manager did indeed send it to Watson and that an inference could be drawn that Watson received it, there is no evidence that Pro Mutual received a copy of that records request. ProMutual never authorized Watson to accept notice of claims or potential claims on its behalf. Watson was never employed by ProMutual; she is, and has been since 1990, a member of the law firm of Ficksman & Conley, LLP.
The mere fact that ProMutual engaged Watson to defend Steinberg in the Friedmann Suit provided Watson with no actual authority to defend Steinberg in the Margolis Suit, an unrelated medical malpractice action, and such engagement provided her with no actual authority to accept notice of new claims or potential claims on behalf of ProMutual. An attorney engaged by a liability insurer to defend its insured against a third-party claim is an independent contractor who owes an unqualified duty of loyalty to the insured and is not an agent of the insurer. Herbert A. Sullivan, Inc. v. Utica Mutual Insurance Co., 439 Mass. 387, 409-10 (2003). Nothing ProMutual did or said reflected its consent to Watson accepting notice of new claims or potential claims on its behalf. See Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 743 n.13 (2000) (“Actual authority results when the principal explicitly manifests consent, either through words or conduct, that the agent should act on behalf of the principal”).
Watson also had no apparent authority to accept notice of claims or potential claims on ProMutual’s behalf. Apparent authority is created when the principal’s words or conduct causes a third party reasonably to believe that the putative agent is authorized to act on the principal’s behalf. Id. at 745. The only action that ProMutual, the principal, took with respect to Watson was the retention of her to represent Steinberg in a matter wholly unrelated to the Margolis Suit. Nothing that ProMutual did or said would lead a reasonable person to conclude that Watson was authorized to accept notice of claims or potential claims completely unrelated to the specific matter for which she had been retained. There is no evidence to suggest that the principal, ProMutual, influenced Steinberg, through words or acts, to treat Watson as a person authorized to accept a notice of claim on behalf of ProMutual.
The representations allegedly made by Watson to Steinberg’s office administrator do not create a material question of disputed fact regarding the existence of a principal-agent relationship between ProMutual and Watson because Watson’s own statements and conduct are not competent evidence of her authority to bind ProMutual. “Apparent authority is not established by the putative agent’s words or conduct, but by those of the principal.” Rubel v. Hayden, Harding & Buchanan, Inc., 15 Mass.App.Ct. 252, 255 (1983).
Accordingly, Steinberg’s transmission to Watson of the request for records made by Margolis’s attorney did not satisfy his obligation to report the Margolis claim to ProMutual within the policy period.
ProMutual’s Alleged Negligence in Performing its Contractual Duties
Steinberg argues that even if he failed to provide notice within the policy period, ProMutual nevertheless is obligated to defend and indemnify him because it negligently failed to notify him of his right to purchase a reporting endorsement following the termination of his policy. In «support of his contention, Steinberg points to ProMutual’s failure to send him a copy of his 2001-2002 policy and its failure to comply with its internal policy of reminding insureds of the reporting endorsement option following a policy termination.
A party bound by a contract to do certain work or perform a service by implication agrees to do a workmanlike job and to use reasonable and appropriate care and skill in doing the acts the contract requires be performed. Herbert A. Sullivan, Inc., 439 Mass. at 395-96. This duty of reasonable care “arises out of the contract and is measured by its terms.” Id. at 396. See Hartford Casualty Insurance Co. v. New Hampshire Insurance Co., 417 Mass. 115, 118 (1994) (insurer may *676 be liable in contract for negligent failure to satisfy contractual promise to defend).
With respect to ProMutual’s alleged negligent failure to send a copy of the renewal policy to Steinberg, such failure is of consequence only to the extent that the renewal policy changed the terms or conditions of the existing policy. Where an insurance company proposes to change the terms or conditions of a renewal policy but fails to deliver a copy of the new policy to the insured or his agent, the result is that the proposed changes fail to take effect and the terms of the preceding policy remain in place. See Epstein v. Northwestern National Insurance Co., 267 Mass. 571, 574 (1929); Couch on Insurance (3d ed.), §29.41.
It is undisputed that the policy forms that preceded the 2001-2002 renewal policy were transmitted to Nixon Insurance and that such forms advised the insured that his policy did not cover claims reported after the expiration of the policy period; provided that if coverage was not renewed, the insured had the right to purchase a reporting endorsement that would extend the period of reporting claims; and advised the insured that in order to exercise his right to purchase a reporting endorsement, he had to notify Pro-Mutual within thirty days of the non-renewal. The fact that Steinberg may not have read any of his policies or coverage forms and that his broker negligently may have failed to advise him of the importance of purchasing a reporting endorsement when he told the broker that he did not want to renew his policy with ProMutual is not material because “an insured is charged with his agent’s knowledge of the terms and conditions of an insurance policy.” Aguiar v. Generali Assicurazioni Ins. Co., 47 Mass.App.Ct. 687, 690 (1999). See also Century Indemnity Co. v. Jameson, 333 Mass. 503, 504 (1956) (“knowledge of the agent was the knowledge of [the insured]”).
Despite the absence of a policy provision or state law or regulation requiring ProMutual to remind Steinberg of his right to purchase a reporting endorsement, Steinberg argues that by implementing an internal policy requiring it to so remind insureds, ProMutual voluntarily assumed a duty toward him and was required to reasonably perform this duty, which it did not. Steinberg also contends that ProMutual’s failure to comply with its internal policy is evidence of its negligence.
While it is true that a company’s failure to follow its own internal procedures may constitute “some evidence of negligence,” Bacon v. Federal Kemper Life Assurance Co., 400 Mass. 850, 861 (1987) , the issue of breach of duty is not reached unless there is a duly in the first instance. The existence of a duty is a question of law. Wallace v. Wilson, 411 Mass. 8, 12 (1991). As a matter of law, ProMutual’s internal policy, about which Steinberg had no knowledge prior to this declaratory judgment action, created no enforceable duty.
Steinberg’s reliance on Cottam v. CVS Pharmacy, 436 Mass. 316 (2002), for the proposition that ProMutual voluntarily assumed a duty to remind him of his right to purchase a reporting endorsement is misplaced. Cottam reiterated that Massachusetts has approved the principles pertaining to voluntary assumption of duty as set forth in the Restatement (Second) ofTorts §323 (1965). Cottam, 436 Mass. at 323. That section of the Restatement provides:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other’s person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of harm, or
(b) the harm is suffered because of the other’s reliance upon the undertaking.
Restatement (Second) ofTorts §323 (1965). By its plain language, section 323 is limited to negligence that causes “physical harm.” The term “physical harm,” in turn, is defined as “the physical impairment of the condition of another’s body, or of land or chattels.” Restatement (Second) ofTorts §7(3) (1965). Steinberg’s allegation of negligence implicates only economic harm and thus falls outside the scope of the duty recognized by section 323. Consistent with the Restatement, each of the cases cited by Steinberg involve physical harm. See Mullins v. Pine Manor College, 389 Mass. 47 (1983) (rape); Thorson v. Mandell, 402 Mass. 744, 745 (1988) (spinal cord injuiy); Cottam 436 Mass. at 319 (persistent erection followed by permanent impotency). See also Woods v. O’Neil, 54 Mass.App.Ct. 768, 769 (2002) (pedestrian struck by vehicle); Fieldwork Boston, Inc. v. United States, 344 F.Sup.2d 257, 264 (D.Mass. 2004) (Section 323 does not apply absent physical harm).
Where, as here, only economic harm is alleged, “ ‘special circumstances of assertion, representation and reliance’ may create a duty of due care.” Martinonis v. Utica Nat’l Life Ins. Group, 65 Mass.App.Ct. 418, 421 (2006). The internal underwriting policy constitutes the only “assertion” by Pro-Mutual. ProMutual made no representation to Steinberg that it would remind him of his right to purchase a reporting endorsement should he choose not to renew his policy. Obviously, there was no reliance by Steinberg on the internal policy because he was oblivious of it prior to the discovery provided in this litigation.
Implied Covenant of Good Faith and Fair Dealing
Steinberg fares no better with his argument that ProMutual’s failure to notify him of his right to purchase a reporting endorsement following termination of his policy violated the implied covenant of good faith and fair *677 dealing. Every contract in Massachusetts is subject to an implied covenant of good faith and fair dealing. See Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 473 (1991). However, it may not be “invoked to create rights and duties not otherwise provided for in the existing contractual relationship.” Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). ProMutual’s failure to remind Steinberg of his right to purchase a reporting endorsement did not injure Steinberg’s right to reap the benefits prescribed by the terms of his policy and, accordingly, did not violate the implied covenant of good faith and fair dealing.
Alleged Ambiguity of Reporting Endorsement Provision
Finally, in a post-hearing filing, Steinberg contends for the first time that the contractual provision pertaining to his right to purchase a reporting endorsement is ambiguous and thus there is an issue of fact that precludes entry of summary judgment. Interpretation of the language of the policy presents a question of law. Camp Dresser & McKee, Inc. v. Home Insurance Co., 30 Mass.App.Ct. 318, 323 (1991). The policy must be construed according to the fair and reasonable meaning of its words with any doubts created by any ambiguous words or provisions resolved against the insurer. The Reporting Endorsement clearly and unequivocally states that an insured has the right, upon payment of an additional premium, to purchase a reporting endorsement in the event of termination either by non-renewal or cancellation of the policy of termination of a reporting period of the insured, provided that the right is exercised by the insured by written notice no later than thirty days after the termination date. The insured is required, therefore, to notify the insurer, no later than thirty days after the termination date, that the insured is exercising the right to purchase a reporting endorsement, which endorsement becomes effective upon payment of the additional premium. Steinberg at no time expressed any interest in exercising his right. Under any construction of the reporting endorsement provision, Steinberg failed to take advantage of his right to purchase additional coverage.
In sum, Steinberg’s coverage under his ProMutual claims-made policy terminated on October 1, 2002; Steinberg did not exercise his right to purchase a reporting endorsement adding additional reporting periods beyond October 1, 2002 to report claims to ProMutual; Steinberg did not report, and ProMutual did not learn of, the Margolis claim within the policy period; and the Margolis claim is not covered by Steinberg’s ProMutual policy. Additionally, ProMutual breached no contractual or other duly of care. ProMutual is entitled to the declaratory relief it requests.
ORDER
For the foregoing reasons, it is hereby ORDERED that ProMutual’s motion for summary judgment be and hereby is ALLOWED, and it is hereby DECLARED that: (1) Medical Professional Mutual Life Insurance Company has no duty to indemnify Lester A. Steinberg, M.D. from any judgment that may be entered against him in the pending medical malpractice suit brought against him by David and Eleanor Margolis; and (2) Medical Professional Mutual Life Insurance Company may discontinue its participation in and funding of the defense of that suit.

 ProMutual does not contend that, had Steinberg sent the request by Margolis’s attorney to its attention, such a transmission would have been insufficient to constitute notice of a claim.